# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

SUSAN KELLY; and TIMOTHY
KELLY,

               Plaintiffs,

vs.

ETHICON, INC.; and JOHNSON &
JOHNSON,

               Defendants.

No. 20-CV-2036-CJW-MAR

**MEMORANDUM OPINION
AND ORDER**

---

## TABLE OF CONTENTS

I.      INTRODUCTION ……………………………………………………… 3

II.     RELEVANT BACKGROUND …………………………………………… 3

III.    PLAINTIFFS' MOTION TO STRIKE ………………………………… 4

      A.    Applicable Law……………………………………………………… 6

      B.    Analysis……………………………………………………………… 6

IV.    DEFENDANTS' SUPPLEMENTAL MOTION FOR
SUMMARY JUDGMENT………………………………………………10

      A.    Applicable Law………………………………………………………10

      B.    Analysis………………………………………………………………11

            1.    Statute-of-Limitations ……………………………………12

     a.  Equitable Estoppel due to Fraudulent Concealment .........22

   2.  Derivative Claims...........................................................23

     a.  Loss of Consortium ................................................23

     b.  Punitive Damages ...................................................25

V.  CONCLUSION .............................................................................25

## I.    INTRODUCTION

This matter is before the Court on defendants Ethicon, Inc. ("Ethicon") and Johnson & Johnson's (collectively "defendants") Supplemental Motion for Summary Judgment on the Statute of Limitations.  (Doc. 93).  On November 10, 2020, plaintiffs Susan Kelly ("plaintiff") and Timothy Kelly ("Timothy") (collectively "plaintiffs") timely filed a resistance.  (Doc. 95).  On November 24, 2020, defendants timely filed a reply.  (Doc. 102).  On December 8, 2020, plaintiffs, with the Court's permission, filed a surreply.  (Docs. 105 & 106).

This matter is also before the Court on plaintiffs' Motion to Strike defendants' Supplemental Motion for Summary Judgment.  (Doc. 94).  On November 24, 2020, defendants timely filed a resistance.  (Doc. 101).  On December 8, 2020, plaintiffs timely filed a reply.  (Doc. 103).

For the following reasons, the Court **denies** plaintiffs' Motion to Strike (Doc. 94), **grants** defendants' Supplemental Motion for Summary Judgment on the Statute of Limitations (Doc. 93), and **dismisses this case with prejudice**.

## II.    RELEVANT BACKGROUND

The Court will briefly recite the facts and procedural history of this case here and incorporate additional facts below as they become relevant.  Plaintiffs have resided in Iowa since at least 1990.  (Doc. 38-1, at 3).  Johnson & Johnson and its subsidiary Ethicon are both New Jersey corporations.  (Doc. 1-1, at 1).

On March 7, 2004, in Waterloo, Iowa, plaintiff was surgically implanted with a tension-free vaginal tape ("TVT") implant manufactured by Ethicon.  *See* (Doc. 39, at 2).  Plaintiff received the implant to stabilize her prolapsed bladder and treat her stress urinary incontinence.  (Docs. 39, at 2; 40-1, at 44).  Plaintiff alleges that she has suffered from, among other things, "depression, pelvic pain, dyspareunia, loss of services of her spouse, continued and worsening incontinence, [urinary tract infections], urinary

retention, abdominal pain, urgency, frequency, and dysuria" as a result of her TVT implant corroding, oxidizing, or eroding. (Doc. 45, at 4) (citing plaintiff's deposition testimony). On September 17, 2014, plaintiff had part of her TVT implant removed in Iowa City, Iowa by Dr. Elizabeth Takacs. (Docs. 39, at 2; 45, at 3).

On February 28, 2014, plaintiffs filed suit in the multidistrict litigation ("MDL") related to defendants' TVT implant in the United States District Court for the Southern District of West Virginia. (Doc. 1). On June 2, 2020, this case was transferred to this Court. (Doc. 62). On August 7, 2020, the Court granted in part and denied in part defendants' motion for partial summary judgment. (Doc. 81). As a result, the only remaining claims are plaintiff's claims for negligence (as it relates to negligent design) (Count I), negligent infliction of emotional distress (Count X), and unjust enrichment (Count XV), Timothy's claim for loss of consortium (Count XVII), and plaintiffs' claim for punitive damages (Count XVII). (*Id.*, at 23). On October 16, 2020, the Court granted defendants' motion to file a successive or supplemental motion for summary judgment on the statute-of-limitations. (Doc. 92, at 29).

### III.   *PLAINTIFFS' MOTION TO STRIKE*

In their motion, plaintiffs ask the Court, under Federal Rule of Civil Procedure 12(f), to strike defendants' Supplemental Motion for Summary Judgment on the Statute of Limitations, strike certain portions of plaintiff's deposition testimony,[1] strike defendants' statute-of-limitations affirmative defense, and prevent defendants from relying on plaintiff's deposition testimony at trial. (Docs. 94, at 1; 94-1, at 9).

---

[1] Plaintiffs do not specify which parts of plaintiff's deposition they ask the Court to strike, stating only that the Court should strike "P.J. Scarr's questions and objections as to any disputed testimony during Plaintiff's deposition and resulting responses thereto." (Doc. 94, at 1–2). Plaintiffs also request, however, that testimony which "supports their claims and arguments" not be stricken. (*Id.*, at 1 n.2).

Some additional background information is necessary before the Court can turn to its analysis. During discovery, defendants gave notice of their intent to depose plaintiff. (Doc. 19). Although plaintiffs objected to some of defendants' requests (Doc. 22), plaintiff still attended the deposition on April 30, 2019 (Doc. 93-3, at 30–80). P.J. Scarr ("Ms. Scarr") conducted plaintiff's deposition on behalf of defendants. (*Id.*). Ms. Scarr is licensed to practice law in West Virginia (but apparently not Iowa) and is an independently contracted attorney for defendants' counsel's law firm, not a staff attorney. *See* (Doc. 101, at 12) (providing Ms. Scarr's West Virginia Bar identification number); (Doc. 101-4) (directing Ms. Scarr to file a notice of appearance in the Southern District of West Virginia in another case in the same MDL); (Doc. 103, at 3) ("There is no dispute that P.J. Scarr is an apparent contract attorney for Defendants."). Ms. Scarr has never filed an appearance in this case. Plaintiff did not object to Ms. Scarr conducting her deposition at the time. (Doc. 93-3, at 30–80). Ms. Scarr also deposed Timothy that same day without objection. (Doc. 101-2).

Plaintiffs argue that because Ms. Scarr has not filed an appearance in this case, the Court should strike portions of plaintiff's April 30, 2019 deposition testimony. (Doc. 94-1, at 2–3, 6–7). Further, because defendants' supplemental motion for summary judgment and statute-of-limitations affirmative defense both rely on such testimony, plaintiffs assert the Court should strike them as insufficient. (*Id.*, at 5).[2]

---

[2] Plaintiffs also argue in the alternative that defendants' motion should be stricken because it "is premised on speculation and immaterial facts" selectively constructed from the record. (Doc. 94-1, at 7–9). As this Court previously stated, defendants' statute-of-limitations defense has sufficient merit to warrant consideration. (Doc. 92, at 28); *see also* (Doc. 81, at 20). Thus, the Court will address such merits in ruling on the underlying motion itself as opposed to striking the motion outright on this basis under Rule 12(f).

## A.    Applicable Law

Federal Rule of Civil Procedure 12(f) provides that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." A district court has wide discretion in ruling on a motion to strike, particularly because Rule 12(f) is permissive in nature. *Holt v. Quality Egg, L.L.C.*, 777 F. Supp. 2d 1160, 1168 (N.D. Iowa 2011). Motions to strike are considered an extreme measure and are thus disfavored and infrequently granted. *Id.* "Nevertheless, a motion to strike should be granted if it may have the effect of making the trial of the action less complicated, or it may have the effect of otherwise streamlining the ultimate resolution of the action." *Nelson v. Long Lines Ltd.*, No. C02-4083-MWB, 2003 WL 21356081, at *3 (N.D. Iowa June 11, 2003) (citation, internal quotation marks, and alteration omitted).[3]

## B.    Analysis

Plaintiffs request the drastic relief of not only striking defendants' supplemental motion for summary judgment, but striking defendants' entire statute-of-limitations defense, striking certain portions of plaintiff's deposition testimony (but not portions favorable to her), and barring defendants from citing such testimony at trial. Plaintiffs request all of this based only on the fact that the attorney who conducted plaintiff's deposition a year and a half ago did not file an appearance in this case. Plaintiffs have not cited any authority holding that such sweeping relief is appropriate under these circumstances. The Court is not aware of any such authority. On its face, the Court

---

[3] Although the Court is skeptical whether a motion to strike can properly address evidentiary issues on summary judgment, as plaintiffs' motion does here, the Court will consider the motion nonetheless. *See, e.g.*, *Burlington N. & Santa Fe Ry. Corp. v. Dakota Mo. Valley & W. R.R., Inc.*, 347 F. Supp. 2d 708, 727 (S.D. Iowa 2004) (citing *Charles E. Hill & Assocs., Inc. v. CompuServe, Inc.*, No. IP97-0434-C-M/S, 2000 WL 1473875, at *11 (S.D. Ind. Aug. 24, 2000) ("[E]videntiary matters submitted in support of . . . a motion for summary judgment are not 'pleadings' within the meaning of Rule 12(f).").

finds the requested remedies overwhelmingly outweigh the cited harm. The Court will, however, parse the merits of plaintiffs' claims.

Title 28, United States Code, Section 1654 provides that, in all federal district courts, parties may be represented by counsel in compliance with the rules of individual courts. Some courts require attorneys to file an appearance if they conduct a deposition in a case. *See, e.g.*, *Middlebrooks v. Sacor Fin., Inc.*, No. 1:17-CV-0679-SCJ-JSA, 2018 WL 4850122, at *24 (N.D. Ga. July 25, 2018) (noting that an attorney who appeared at the plaintiff's deposition was instructed to file a notice of appearance by the end of the day and cautioned that such a notice was required under the court's local rules); *see also* N.D. Ga. LR 83.1(D)(1) ("An attorney whose appearance has not been noticed will not be permitted to represent a party at trial or in any other Court proceeding until the attorney has filed a Notice of Appearance."). Other courts do not require a notice of appearance from an attorney under such circumstances. *See, e.g.*, *Hernandez-Martinez v. Chipotle Mexican Grill, Inc.*, No. 11 C 4990, 2013 WL 2384251, at *2 (N.D. Ill. May 30, 2013) ("An attorney need not file an appearance in order to take a deposition."); *Walters v. Cent. States Coca-Cola Bottling Co.*, No. 98 C 4526, 2001 WL 1263680, at *8 (N.D. Ill. Oct. 17, 2001) (finding a deposing attorney was not required to file a notice of appearance because depositions are not conducted under court supervision). The Southern District of West Virginia's Local Rules do not discuss when an attorney must enter an appearance.[4]

---

[4] Plaintiffs note that Local Rule 83.7 of the Southern District of West Virginia requires compliance with the Model Rules of Professional Conduct. (Doc. 94-1, at 3–4). Plaintiffs then suggest that Model Rule of Professional Conduct 5.5(c)(2) applies here. This rule concerns the temporary practice of law before a court by an attorney admitted to practice in a different jurisdiction. Here, when Ms. Scarr conducted plaintiff's deposition, this matter was still in the Southern District of West Virginia where Ms. Scarr is licensed to practice. Thus, the Court finds this Model Rule inapplicable here.

Case 6:20-cv-02036-CJW-MAR    Document 107    Filed 01/06/21    Page 7 of 25

It is far from clear whether Ms. Scarr violated any rule at all by conducting a deposition without entering an appearance. The Southern District of West Virginia's Local Rules provide no guidance on this topic. Given that the Southern District of West Virginia retroactively required Ms. Scarr to file a notice of appearance in another case in the same MDL, it appears that the court at least prefers that attorneys file a notice of appearance if it does not outright require it. *See* (Doc. 101-4).

Even if Ms. Scarr was required to file a notice of appearance, plaintiffs have not shown how Ms. Scarr's appearance at the deposition prejudiced them in any way. *See Walters*, 2001 WL 1263680, at *8 ("There is no conceivable way in which plaintiff was harmed by [the attorney's] failure to file a notice of appearance."). Plaintiffs argue only that they "are prejudiced by having to address Defendants' insufficient statute of limitations defense," (Doc. 103, at 4), not that Ms. Scarr's appearance itself is injurious to them. Plaintiffs also argue that the Court should grant their motion to preserve public trust in the bar and the courts. (*Id.*, at 2–3). The Court fails to see how this issue has any perceivable impact on the legitimacy of the bar or the courts.

The lack of prejudice here is particularly evident for several reasons. First, plaintiffs did not object to Ms. Scarr's appearance at the time of the deposition. Second, plaintiffs previously submitted testimony from the deposition Ms. Scarr conducted to the Court. (Doc. 45-1). Third, plaintiffs raise this issue only now, a year and a half later, when parts of plaintiff's testimony are potentially unfavorable to her.[5] Fourth, plaintiffs

_____

Plaintiffs also cite this Court's Local Rules 83(d)(1) and 83(d)(5) (*Id.*, at 4), which state that "[o]nly a member of the bar of the district may appear as a lawyer" here unless they have been admitted pro hac vice and also that lawyers not listed on the first pleading must file a notice of appearance before representing a party in "any action or proceeding." Again, because Ms. Scarr was not involved in this case following transfer to this Court, these rules do not apply to her. Even if all these rules applied, it would not change the Court's analysis.

[5] Plaintiffs argue they were not required to object at the deposition because a pretrial order stated that "[a]ll deposition objections are reserved" and that any prior objection would have been

do not seek to jettison all of plaintiff's deposition testimony, but rather, only the parts that do not support their arguments. (Doc. 94, at 1 n.1) ("Plaintiffs will allow certain testimony to remain part of the record that supports their claims and arguments."). Last, plaintiffs do not object to Timothy's deposition which was also conducted by Ms. Scarr on the same day. In sum, plaintiffs' motion is more so an attempt to editorialize plaintiff's deposition testimony rather than to redress any issue relating to Ms. Scarr's appearance.

Again, it is not clear that Ms. Scarr's taking of a deposition without filing an appearance violated any rule, but even if it did, the Court would not grant plaintiffs' Motion to Strike. The drastic remedies plaintiffs seek far outweigh the harm, if any, plaintiffs seek to redress. The Court also declines to require Ms. Scarr to retroactively file a notice of appearance here, as other courts have done. Her involvement in this case ended long before this matter came before this Court and discovery has long since closed. Requiring her to file an appearance after her involvement has ended serves no purpose and offers no relief in itself to plaintiffs.

Thus, in the exercise of its discretion under Federal Rule of Civil Procedure 12(f), the Court finds that plaintiffs' requested remedies are not appropriate and **denies** plaintiffs' Motion to Strike. (Doc. 94).

---

premature until the filing of defendants' present motion. (Doc. 103, at 2). The pretrial order cannot reasonably be read to mean that an attorney need not raise an issue about the procedures of the deposition itself as opposed to the questions asked or answers given. Further, plaintiff's deposition testimony has come up previously in this case and, thus, her objection to such testimony now is tardy. Even if nothing formally required plaintiff to address this earlier, the Court still finds that raising this technical procedural issue for the first time a year and a half after it occurred is untimely and inefficient. The Court also fails to see the relevance of Federal Rule of Civil Procedure 32(b), which plaintiffs also cite. *See* (Doc. 103, at 4).

## IV. DEFENDANTS' SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

### A. Applicable Law

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). More specifically, a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted), or "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks and citation omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it

requires "a jury or judge to resolve the parties' differing versions of the truth at trial." *Id*. at 249 (citation and internal quotation marks omitted).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587-88 (citation omitted); *see also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009) (stating that in ruling on a motion for summary judgment, a court must view the facts "in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them") (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citation omitted). Rather, a "court's function is to determine whether a dispute about a material fact is genuine[.]" *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996). When considering a motion for summary judgment, the court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

**B.     Analysis**

Defendants argue that plaintiff's three remaining claims for negligent design, negligent infliction of emotional distress, and unjust enrichment are all barred by Iowa's two-year statute-of-limitations on personal injury claims. (Doc. 93-1, at 4–7). Defendants further argue that, as a result of plaintiff's underlying claims being time-barred, Timothy's loss of consortium claim and plaintiffs' punitive damages claim are also barred because they are derivative of plaintiff's underlying claims. (*Id.*, at 7–8). The Court will address each issue in turn.

### 1.    *Statute-of-Limitations*

Under Iowa law, claims based on personal injury are subject to a two-year statute-of-limitations.    IOWA CODE § 614.1(2).    "Under the discovery rule, the statute of limitations begins to run when the injured person discovers or in the exercise of reasonable care should have discovered the allegedly wrongful act."  *Franzen v. Deere & Co.*, 377 N.W.2d 660, 662 (Iowa 1985) (citation omitted).  In other words, "the statute of limitations begins to run when a plaintiff first becomes aware of facts that would prompt a reasonably prudent person to begin seeking information as to the problem and its cause."  *Estate of Montag ex rel. Montag v. T H Agric. & Nutrition Co.*, 509 N.W.2d 469, 470 (Iowa 1993).  Thus, under Iowa law, the limitations period begins to run upon inquiry notice, not actual knowledge.  *Roth v. G.D. Searle & Co.*, 27 F.3d 1303, 1306 (8th Cir. 1994).

Specifically, in a personal injury action arising from a defective product, claims begin to accrue when "the plaintiff discovers or reasonably should have discovered the injury, its product-related cause, and the product's defective and unreasonably dangerous condition."  *Bressler v. Graco Children's Prods., Inc.*, 43 F.3d 379, 380–81 (8th Cir. 1994) (finding a genuine issue of material fact existed as to whether the plaintiff parents should have known within two years that a defective cradle caused their baby's death when they were initially told their baby died of sudden infant death syndrome); *see also Buechel v. Five Star Quality Care, Inc.*, 745 N.W.2d 732, 737–38 (Iowa 2008) (holding no genuine issue of material fact existed because plaintiffs knew or should have known from the outset that a defective bed frame caused a nursing home resident's asphyxiation death).  A plaintiff need not be aware of a specific defect in the product for the statute-of-limitations to begin running.  *Buechel*, 745 N.W.2d at 738.  Rather, the plaintiff need only have reason to believe a defect may exist which requires investigation, and which would have revealed the defect.  *Id.*  In sum, a plaintiff's duty to investigate the facts

12

surrounding their injury "does not depend on exact knowledge of the nature of the problem that caused the injury." *Franzen*, 377 N.W.2d at 662. "It is sufficient that the person be aware that a problem existed" even if they did not know that the facts at issues could constitute a cause of action. *Id.*

The two-year statute-of-limitations in Iowa Code Section 614.1(2) applies to plaintiff's claims here because her claims are founded on alleged injuries to her person. Thus, the discovery rules also apply,[6] and the question then becomes when plaintiff became "aware of facts that would prompt a reasonably prudent person to begin seeking information as to the problem and its cause." *See Estate of Montag*, 509 N.W.2d at 470. If plaintiff became aware of such facts earlier than February 28, 2012, her claims filed on February 28, 2014, are barred by the two-year statute-of-limitations.[7]

_____

[6] Plaintiffs argue that the discovery rule is inapplicable to plaintiff's alleged injuries that arose in 2013 and 2014, the latter injuries occurring even after this lawsuit was filed. (Doc. 95, at 5–6). Plaintiffs do not explicitly take a position on whether the discovery rules apply to plaintiff's other injuries. (*Id.*). First, the discovery rule applies to all of plaintiff's injury-based claims; the question is whether her claims are ultimately barred under the two-year statute-of-limitations. Thus, what plaintiffs likely mean to argue is that plaintiff's 2013 and 2014 injuries are not time-barred because the two-year statute-of-limitations had not elapsed by the time she filed this action. Second, as described above, the statute-of-limitations begins to run when a plaintiff "discovers or reasonably should have discovered the injury, its product-related cause, and the product's defective and unreasonably dangerous condition." *See Bressler*, 43 F.3d at 380–81. In other words, the discovery of new medical issues or attribution of such issues to the original injury does not refresh or restart an expired limitations periods. *See LeBeau v. Dimig*, 446 N.W.2d 800, 802–03 (Iowa 1989) (holding that plaintiffs cannot split a cause of action into successive lawsuits arising out of the same injury merely because different injuries arose later).

[7] Plaintiffs mischaracterize the record as to the Court's prior discussion of the discovery rule. First, plaintiffs assert that "the discovery rule [was] irrelevant and not dispositive of [plaintiff's] breach of implied warranty claim" at the summary judgment stage. (Doc. 95, at 3 n.1, 4 n.5). Plaintiffs appear to argue the Court should not have addressed the discovery rule when ruling on summary judgment. *See* (Doc. 81, at 18–20). Plaintiffs, however, raised the discovery rule and asserted that its application spared plaintiff's breach of implied warranty claim. (Doc. 45, at 16). The Court found that the discovery rule did not apply, and that plaintiff's breach of implied warranty claim was barred by the five-year statute-of-limitations. (Doc. 81, at 19–20).

Defendants, citing plaintiff's testimony and her medical records, assert that plaintiff "was aware of the injuries she attributes to the [TVT implant] within months of her March 2004" implantation surgery. (Doc. 93-1, at 2–4, 6–7). Defendants argue that because plaintiff knew or reasonably should have known of her injuries some time in 2004, the two-year statute-of-limitations began to run at that time. (*Id.*, at 7). Thus, defendants conclude that the limitations period expired some time in 2006, long before plaintiffs filed this action on February 28, 2014. (*Id.*).

Plaintiffs argue that there is a genuine issue of material fact as to whether plaintiff knew or reasonably should have known prior to February 28, 2012, that she was injured and that her injuries were caused by her allegedly defective TVT implant. (Doc. 95, at 7). For example, plaintiffs argue a reasonable jury could conclude that plaintiff's symptoms in the years following her implantation surgery were normal, post-operative side effects that would not inherently indicate to a reasonable person that they were

---

Addressing plaintiff's argument in the alternative, however, the Court found that even if the discovery rule applied that plaintiff's claim would be barred because she "knew or should have known about her alleged injuries long before the filing of this case in February 2014." (*Id.*, at 20). Thus, although the discovery rule was indeed irrelevant and not dispositive of plaintiff's breach of implied warranty claim, plaintiffs raised the issue, not the Court.

Second, plaintiffs characterize the Court's prior discussion of the discovery rule as a "predetermination" or being "predetermined." (Doc. 95, at 4, n.5). This issue has not been predetermined. When the Court made its alternative finding at the summary judgment stage, it merely addressed the argument plaintiffs raised as to plaintiff's breach of implied warranty claim. It made no other findings about the discovery rule. When the Court quoted its prior alternative finding in ruling on defendants' motion for leave to file a supplemental motion for summary judgment, it merely laid out the procedural history of defendants' motion. (Doc. 92, at 24). The Court did not adopt, bolster, support, or extend its prior alternative finding in any way. To the contrary, the Court explicitly declined to discuss the merits of defendants' argument on the discovery rule to allow the parties to fully brief the issue. (*Id.*, at 28, n.11). In short, the Court's prior discussion of the discovery rule was proper based on plaintiffs' own arguments and the Court has not made any predeterminations about the discovery rule as to plaintiffs' remaining claims.

14

injured by the implant. (*Id.*). Plaintiffs also note that plaintiff underwent an unrelated pelvic organ prolapse procedure in May 2013 which improved her stress urinary incontinence symptoms, thus leading plaintiff to believe that her TVT implant was not causing her stress urinary incontinence. (*Id.*). Also, according to plaintiffs, no doctors told plaintiff the TVT implant was defective, such defects were not open and obvious, there was no media publicity about such defects, and she did not have any part of the TVT implant removed until 2014. Thus, plaintiffs conclude plaintiff could not have reasonably known that the TVT implant was causing her injuries or that it was defective at all. (*Id.*, at 7–9).

The record shows that plaintiff was aware of at least some of her alleged injuries shortly after her implantation surgery in March 2004. On her Plaintiff Fact Sheet, plaintiff was asked: "When is the first time you experienced symptoms of any of the bodily injuries you claim in your lawsuit to have resulted from the pelvic mesh product(s)?" (Doc. 93-3, at 8). Plaintiff answered: "Shortly after implantation I had to begin self-cathing, [urinary tract infections ("UTIs")] became regular occurrences, and sex was affected." (*Id.*).[8] When asked what injuries resulted from the implantation surgery, plaintiff cited "[s]everal UTI's," "pain associated with the incontinence," and pain during sex which "restricted" her sexual activity to such an extent that she does "not even participate." (*Id.*). Plaintiff further stated that she sought medical care for these injuries "[i]mmediately following due to self-cathing and UTI's." (*Id.*, at 9). Given plaintiff's mention of self-cathing and UTIs in multiple answers, the only reasonable

---

[8] Plaintiffs admit these statements but object that they are "irrelevant and immaterial" to the Court's statute-of-limitations analysis. (Doc. 95-1, at 2). These statements are plainly relevant in ascertaining when plaintiff knew or reasonably should have known of her injuries and their cause. Plaintiffs object without elaboration to every piece of plaintiff's testimony cited by defendants as either irrelevant, immaterial, lacking foundation, speculative, or vague. (Doc. 95-1). The Court similarly finds these objections to be uniformly unmeritorious.

15

interpretation of this answer is that she sought medical care "immediately following" the implantation surgery.

At her April 30, 2019 deposition, plaintiff testified her stress urinary incontinence ceased following her March 2004 implantation surgery and then returned to some extent six months later in September 2004. (Doc. 93-3, at 49). She estimated that she began wearing incontinence pads again around a year after the implantation surgery. (*Id.*). She stated that her stress urinary incontinence then gradually worsened until she had a bladder surgery in 2013, at which time it improved before worsening again. (*Id.*). As for UTIs, plaintiff estimated that she had a UTI about once every six months both before her 2004 implantation surgery and after the surgery until 2010 when she began having a UTI every six weeks. (*Id.*, at 46–47, 48).

Medical records also reflect that most of plaintiff's cited injuries arose around 2004 following the implantation surgery. Plaintiff's June 2014 patient summary from the Northern Iowa Urological Associates, P.C. states that she told them that "the onset of the freq[uent] UTI's was after she had the sling placed." (Doc. 93-3, at 81). 'The sling' here can only reasonably refer to the TVT implant because the same page notes that plaintiff had retained an attorney to pursue legal action concerning her "recalled sling." (*Id.*). The same report notes that her UTIs began ten years ago, i.e. 2004. (*Id.*, at 82).

Plaintiff's expert Dr. Rosenzweig's opinion also details plaintiff's relevant medical history. (Doc. 40-1, at 6–12). At the time of implantation in early March 2004, Dr. Rosenzweig notes that plaintiff had a history of, among other things, uterine prolapse, cystocele, and urinary incontinence, but not UTIs. (*Id.*, at 6). Following the implantation, plaintiff returned to the hospital four times that same month, twice for apparently normal post-operative check-ups, once to report a UTI, and once to report her frequent self-cathing. (*Id.*, at 7). Throughout the remainder of 2004, plaintiff complained of urinary urgency and increased urinary frequency and suffered another

16

UTI. (*Id.*, at 8). In January 2005, she again reported increased urinary frequency as well as dysuria and "feeling [like] something was 'pulling' in her abdomen." (*Id.*). Her vaginal and urinary health issues persisted into 2006, when she began reporting blood in her urine and a burning sensation when she urinated. (*Id.*, at 8–9). She was also diagnosed with another UTI in May 2006. (*Id.*, at 9). Plaintiff visited multiple doctors about these same health issues on many occasions through 2007 into 2010. (*Id.*, at 10–12). In October 2010, a doctor noted that plaintiff had two UTIs in the past four months along with hematuria and dysuria and was currently taking medication for her UTIs. (*Id.*, at 11–12). Dr. Rosenzweig also quotes a note from Dr. Takacs stating that plaintiff's "history of dyspareunia start[ed] following [her] mesh placement as well as persistent and recently worsening urgency and frequency." (*Id.*, at 18). In sum, plaintiff's medical records show that plaintiff was undoubtedly aware of the pelvic health issues she now complains of shortly after her 2004 surgery and that such issues gradually worsened.

When, precisely, plaintiff reasonably should have attributed such injuries to her TVT implant is less certain. When asked when she attributed her injuries to the TVT implant, plaintiff answered: "I am not sure. At some point we decided the mesh was the cause and we had it removed." (Doc. 93-3, at 9). After testifying that her UTIs increased in frequency in 2010, plaintiff was asked what she thought was causing them at the time. (*Id.*, at 47). Plaintiff answered "I didn't know. . .. And then eventually in my mind it clicked that maybe I needed to have the mesh looked at." (*Id.*). Plaintiff then testified that this idea 'clicked' when, in June 2014, Dr. Jean Richardson refused to treat her and referred her to Dr. Takacs. (*Id.*).[9] Plaintiffs now assert that plaintiff reasonably did not know that the TVT implant may be the cause of her injuries until Dr. Takacs told her as

---

[9] Plaintiff initially testified that Dr. Richardson would not treat her because her TVT implant was "very corroded." (Doc. 93-3, at 47). Plaintiff quickly revised her testimony to say that Dr. Richardson did not identify an issue with her TVT implant and instead refused to treat her because his hands were too big. (*Id.*, at 48).

much in July 2014. (Doc. 95-2, at 3). But plaintiffs already retained counsel in relation to this action in September 2013 (*Id.*, at 3) and filed this action in February 2014 (Doc. 1). Further, plaintiff told Dr. Richardson during their meeting that she had a "recalled sling" and that she had already retained counsel. (Doc. 93-3, at 47). Thus, plaintiff must have attributed her injuries to the TVT implant at some point prior to her meetings with Dr. Richardson and Dr. Takacs, as well as before she had part of the implant removed in September 2014.

The Court finds that a reasonable jury could only conclude that plaintiff was on at least inquiry notice of her injuries and their cause by no later than some time in 2010. By 2010, she had suffered from most of the injuries she now cites for around six years following the implantation surgery, far past the time for being normal, post-operative complications. Such injuries gradually worsened over time and plaintiff began to experience related issues such as blood in her urine, a burning sensation when she urinated, and feeling discomfort in her abdomen. Her incontinence also worsened and her UTIs significantly increased in frequency in 2010. In light of these facts, plaintiff reasonably should have known that her TVT implant was not merely ineffective, but potentially injurious. A reasonable person, by this point, would have at least initiated a discussion with a healthcare professional about whether the TVT implant might be the cause of these conditions. Her injuries, particularly her UTIs and stress urinary incontinence, either began after the implantation surgery or significant worsened thereafter. By 2010 at the latest, her conditions were undisputedly a frequent and unpleasant disruption in her life. The fact that these conditions arose or increased after the implantation surgery and worsened over the course of years put plaintiff on at least inquiry notice that a defect in the TVT implant may be the cause. This is true regardless of whether a doctor told plaintiff the TVT implant may be the cause, whether she had parts of the implant removed, or whether there was significant media publicity about

potential issues with such implants. Again, the standard is not when plaintiff had actual knowledge of her injuries and their cause, i.e. when a doctor or a TV commercial told her explicitly that defects in the TVT implant may be the cause of her injuries. Rather, the clock begins to run when she became "aware of facts that would prompt a reasonably prudent person to *begin seeking information* as to the problem and its cause." *See Estate of Montag*, 509 N.W.2d at 470. In sum, plaintiff was aware of facts and had reason to believe by 2010 at the latest that some defect in the TVT implant may be causing her ongoing and worsening conditions. Such facts reasonably should have prompted her to begin seeking information at that time.

Further, had plaintiff investigated whether her TVT implant was causing her injuries some time in 2010, a reasonable jury could only find that her investigation would have been fruitful. On October 20, 2008, the Food and Drug Administration ("FDA") issued a public health notification entitled "Serious Complications Associated with Transvaginal Placement of Surgical Mesh in Repair of Pelvic Organ Prolapse and Stress Urinary Incontinence."[10] The notice concerned rare but serious potential complications reported about the use of surgical mesh, most prominently "vaginal epithelium, infection, pain, urinary problems, and recurrence of prolapse and/or incontinence." *Id*. Some other patients reported dyspareunia. *Id*. This report concerned the types of products and injuries plaintiff now complains of. "[E]ven the most basic inquiry would have led" plaintiff to the FDA's notification about transvaginal mesh products. *See Timothy v. Boston Sci. Corp.*, 665 Fed App'x 295, 298 (4th Cir. 2016); *see also Hutchinson v. Boston Sci. Corp.*, No. 20-cv-1084-RGA, 2020 WL 5752393, at *4 n.3 (D. Del. Sept. 25, 2020) (taking judicial notice of the fact that, by 2008, "there was a known connection between pelvic mesh implants and the types of injuries that Plaintiff claims to have

---

[10]    Available at: http://wayback.archive-it.org/7993/20170111190506/http://www.fda.gov /MedicalDevices/Safety/AlertsandNotices/PublicHealthNotifications/ucm061976.htm.

suffered"); *Tily v. Ethicon Inc.*, No. 20-2582, 2020 WL 5369724, at *5 (E.D. Pa. Sept. 8, 2020) (noting the FDA's 2008 notification and the following flood of litigation in support of its finding that "even minimal diligence" would have uncovered "abundant facts and evidence" as to the cause of the plaintiff's injury). Despite this, there is no evidence that plaintiff conducted such an investigation or initiated a discussion with a healthcare provider about whether her TVT implant may be causing her injuries. In light of the facts discussed above, the Court finds plaintiff's failure to investigate was unreasonable.

Plaintiffs argue that the Court cannot consider the FDA's notification because it is irrelevant and inadmissible, there is no evidence plaintiff or her doctors ever saw it, because it was written for a medical audience as opposed to the general public, and because the notice itself did not explicitly state that transvaginal mesh products were not safe or effective. (Doc. 106, at 2–4). First, the existence of the notice is relevant in assessing whether a basic inquiry by plaintiff into her allegedly implant-related injuries would have revealed the potential existence of a defect. *See Buechel*, 745 N.W.2d at 738. Second, the standard is whether plaintiff "reasonably should have discovered the injury, its product-related cause, and the product's defective and unreasonably dangerous condition." *See Bressler*, 43 F.3d at 380–81. Thus, it is immaterial whether she or her physicians read the FDA's notification. Third, the fact that the FDA's notification was written for a medical audience does not prevent a lay person such as plaintiff from recognizing the products at issue and the injuries discussed. Last, although the FDA's notification does not use the words 'safe' or 'effective,' it explicitly finds that the type of injuries plaintiff now complains of are linked to the type of medical device she was implanted with. The fact that plaintiff reasonably should have investigated and found the

FDA's notification with this information, even if she did not actually do so, is relevant to the Court's analysis here.[11]

Thus, the Court finds that there is no genuine issue of material fact on this issue, even construing the record in the light most favorable to plaintiffs. A reasonable jury could only conclude, at best, that plaintiff "reasonably should have discovered the injury, its product-related cause, and the product's defective and unreasonably dangerous condition" by 2010. *See Bressler*, 43 F.3d at 380–81. Thus, the statute-of-limitations expired on her claims sometime two years later in 2012 at the latest, long before she filed her claims in February 2014. Her frequent and worsening pelvic injuries following the surgery gave her ample reason to believe that a defect in the TVT implant may be the cause. By 2010, plaintiff was experiencing a wide variety of pelvic health issues, chief among them her UTIs which were increasing in frequency. Had plaintiff conducted a reasonable investigation at that time, it would have drawn a link between her injuries and the TVT implant and thus enabled her to timely bring these claims. Plaintiff did not conduct such a reasonable investigation. Thus, her claims here, brought at least four

---

[11] Plaintiffs also encourage the Court to rely on *Wegmann v. Ethicon, Inc.*, No. 4:20-CV-00704 JAR, 2020 WL 5814475 (E.D. Mo. Sept. 30, 2020) and *Sanchez v. Boston Science Corp.*, No. 2:12-cv-05762, 2014 WL 202787 (S.D. W. Va. Jan. 17, 2014). (Doc. 106, at 2–3, 5). *Wegmann*, although factually similar, applied a far more generous five-year statute-of-limitations under Missouri law. 2020 WL 5814475, at *7–8. Further, the Court does not cite the FDA's notification as a form of notice, as *Wegmann* rejects, *id.* at *8, but rather as an example that minimal investigation by plaintiff would have revealed an explicit connection between the TVT implant and her injuries. As to *Sanchez*, the Southern District of West Virginia did not find that arguments based on the FDA's notification were irrelevant and meritless as plaintiffs state. (Doc. 106, at 5). Rather, the court found those arguments convincing but still concluded that a reasonable jury could go the other way. *Sanchez*, 2014 WL 202787, at 8 ("If I were permitted to weigh [the] evidence, it is unlikely [the plaintiff] would prevail . . .. I must reluctantly conclude that there is a genuine issue [as to] when [the plaintiff] suspected that wrongdoing caused her injuries."). Moreover, *Sanchez* was a closer case timewise, given the plaintiff's implantation surgery in January 2010 and filing of her lawsuit in September 2012. *Id.* at *1, *3. For these reasons, the Court finds these cases distinguishable and inapplicable here.

21

years after she reasonably should have discovered her injuries, are outside of Iowa's two-year statute-of-limitations.

For these reasons, the Court finds that plaintiff's three remaining claims for negligence (as it relates to negligent design) (Count I), negligent infliction of emotional distress (Count X), and unjust enrichment (Count XV) are barred by the applicable statute-of-limitations. The Court will first consider an alternative argument from plaintiffs before examining the two allegedly derivative claims remaining; Timothy's loss of consortium claim and plaintiffs' punitive damages claim.

### a. *Equitable Estoppel due to Fraudulent Concealment*

Plaintiffs also argue that defendants should be barred from invoking the statute-of-limitations as an affirmative defense under the doctrine of fraudulent concealment, a form of equitable estoppel. (Doc. 95, at 9–11) (citing *Christy v. Miulli*, 692 N.W.2d 694, 700–01 (Iowa 2005)). Plaintiffs acknowledge that this doctrine requires proof of justifiable reliance. (*Id.*, at 10) (citing *Bruns v. Hartford Acc. & Indem. Co.*, 407 N.W.2d 576, 580) (Iowa 1987)). The Court has twice found that there is no evidence that either plaintiff or her surgeon read or relied upon any representations by defendants and thus rejected this equitable estoppel and fraudulent concealment argument. (Docs. 81, at 13–14, 16; 92, at 22).

Even setting aside the justifiable reliance issue, equitable estoppel due to fraudulent concealment only bars a defendant from invoking a statute-of-limitations defense when the defendant "induced [the plaintiff] to refrain from bringing a timely action by the defendant's fraud, misrepresentation, or deception." *Christy*, 692 N.W.2d at 701 (citation omitted). As discussed, plaintiff knew or reasonably should have known that the TVT implant may have caused her injuries years ago. Nothing prevented plaintiff from suing at that time. Thus, any failure to disclose defects with the TVT implant on

22

defendants' part did not "prevent[ plaintiff] from seeking redress within the period of limitations." *Id.* (citation omitted).

For these reasons, the Court finds that the doctrine of fraudulent concealment does not apply here because there was no justifiable reliance and defendants did not prevent plaintiffs from timely bringing their claims. Thus, the Court finds that defendants are not barred from asserting their statute-of-limitations defense.

### 2. *Derivative Claims*

Defendants also assert that Timothy's loss of consortium claim and plaintiffs' punitive damages claim are both derivative of plaintiff's other claims. (Doc. 93-1, at 7–8). Because plaintiff's underlying claims are barred by the statute-of-limitations, defendants conclude these remaining derivative claims cannot afford relief. (*Id.*).

### a. *Loss of Consortium*

"It is well established that [loss of] consortium is the separate property right of each spouse; it is an independent, nonderivative claim." *Huber v. Hovey*, 501 N.W.2d 53, 57 (Iowa 1993). Iowa law holds that the spouse of an injured plaintiff suffers their "own physical, psychological and emotional pain" when their husband or wife "is no longer capable of providing the love, affection, companionship, comfort or sexual relations concomitant with a normal married life." *Fuller v. Buhrow*, 292 N.W.2d 672, 675 (Iowa 1980) (citation omitted). Thus, a plaintiff spouse "is simply a foreseeable plaintiff to whom [a defendant] owes a separate duty of care." *Id.* Although loss of consortium is its own separate claim, it "cannot lie against a defendant when, as a matter of law, the defendant is not liable to the plaintiffs." *Bergfeld v. Unimin Corp.*, 226 F. Supp. 2d 970, 983 (N.D. Iowa 2002) (citing *James v. Burlington N., Inc.*, 587 N.W.2d 462, 464–65 (Iowa 1998) (dismissing a plaintiff's loss of consortium claim, although not explicitly, after finding the defendant was not liable on the underlying claims) *aff'd*, 319

23

F.3d 350 (8th Cir. 2003)).  In other words, if a defendant is not liable for a plaintiff's injuries, the plaintiff's spouse's "claim for loss of consortium also fails." *Id.*

Some courts applying Iowa law, including this Court, have characterized loss of consortium claims as "derivative." *See, e.g.*, *Willet v. Johnson & Johnson*, 465 F. Supp. 3d 895, 911 (S.D. Iowa 2020) (occurring in the same MDL as the case here); *Neely v. Am. Fam. Mut. Ins. Co.*, 930 F. Supp. 360, 376 (N.D. Iowa 1996).  This characterization is imprecise but not wholly inaccurate.  Loss of consortium claims are derivative in the sense that they are predicated on a finding that the defendant injured the underlying plaintiff.  Such claims are not derivative in the sense that they seek redress for the separate harm endured by the underlying plaintiff's spouse.

Regardless of the characterization, "loss of consortium claims will be dismissed if the injured party cannot recover from the defendant on the underlying claims." *See, e.g.*, *Oppedahl v. Navistar, Inc.*, No. 4:14-cv-00475-SMR-CFB, 2015 WL 12866992, at *8 (S.D. Iowa June 9, 2015) (citing *Bergfeld*, 226 F. Supp. 2d at 983).  This is true even if the defendant is not liable by virtue of some statutory limitation on the underlying claims.  *Id.* ("Because the statute of repose bars the [underlying] strict liability and negligence claims . . ., it follows the loss of consortium claims . . . fail also.  Summary judgment on [the loss of consortium claims] is thus appropriate.").

Plaintiffs' arguments otherwise are unavailing.  (Doc. 95, at 11–14).  Whether plaintiffs' sexual relationship was affected before 2013 is immaterial; Timothy's loss of consortium claim is subject to summary judgment because defendants are not liable on plaintiff's underlying claims due to the statute-of-limitations.  Authority cited by plaintiffs to the contrary is inapplicable because it applies Missouri law, not Iowa law.  *See Kingman v. Dillard's, Inc.*, 721 F.3d 613, 620 (8th Cir. 2013).  Further, plaintiffs' apparent assertion that Timothy was physically injured by or experienced discomfort during sex from the TVT implant is not supported by their record citation.  *See* (Doc.

95-3, at 19–20) (wherein Timothy testified that there was "discomfort [from] the mesh" which impacted plaintiffs' sexual activity but not specifying who felt the discomfort, later clarifying that sex was painful for plaintiff and that it was difficult to witness her in pain).

For these reasons, the Court finds that Timothy's loss of consortium claim fails as a matter of law because defendants are not liable on the underlying claims due to the statute-of-limitations having expired. This is true whether or not loss of consortium claims are strictly considered 'derivative' under Iowa law.

### b.    *Punitive Damages*

The parties agree that a claim for punitive damages is derivative. (Docs. 93-1, at 8; 95, at 15); *see also Campbell v. Van Roekel*, 347 N.W.2d 406, 410 (Iowa 1984) ("Punitive damages are merely incidental to the main cause of action."). Thus, the grant of summary judgment on the other claims at issue requires that summary judgment also be granted on plaintiffs' claim for punitive damages.

### V.    *CONCLUSION*

For these reasons, plaintiffs' Motion to Strike (Doc. 94) is **denied** and defendants' Supplemental Motion for Summary Judgment on the Statute of Limitations (Doc. 93) is **granted** as to all of plaintiffs' remaining claims, namely plaintiff's claims for negligence (as it relates to negligent design) (Count I), negligent infliction of emotional distress (Count X), and unjust enrichment (Count XV), Timothy's claim for loss of consortium (Count XVII), and plaintiffs' claim for punitive damages (Count XVII). This case is **dismissed with prejudice**. The Clerk of Court is **directed** to enter judgment in favor of defendants and against plaintiffs.

**IT IS SO ORDERED** this 6th day of January, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa